THE HONORABLE ROBERT S. LASNIK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| ROBERT FOX, an individual, | NO. 2:19-cv-00955-RSL |
| Plaintiff, | **PLAINTIFF'S TRIAL BRIEF** |
| v. | TRIAL DATE: MARCH 28, 2023 |
| CITY OF BELLINGHAM, | |
| Defendant. | |

Plaintiff Robert Fox submits this Trial Brief in advance of the jury trial against Defendant City of Bellingham scheduled to begin on March 28, 2023.

## I.      NATURE OF ACTION

This is a case about the amount of damages Mr. Fox is entitled to for the mental and emotional pain and suffering he experienced as a result of the City of Bellingham's admitted tortious interference with the body of his deceased brother, Bradley Ginn Sr.  Mr. Fox will present at trial the single claim of Tortious Interference with a Corpse.

The facts underlying Mr. Fox's claim against the City are largely undisputed.  On July 31, 2018, Mr. Fox's brother, Bradley Ginn Sr., suffered a medical emergency.  Bellingham Fire Department paramedics Steve Larsen and Aaron Wolven responded to this emergency and transported Mr. Ginn following his medical emergency. Mr. Larsen and Mr. Wolven knew at the time that Mr. Ginn had a "Do Not Resuscitate" Order. Mr. Ginn stopped breathing on the

PLAINTIFF'S TRIAL BRIEF - 1
No. 2:19-cv-00955-RSL

**Corr|Downs PLLC**
100 WEST HARRISON STREET
SUITE N440
SEATTLE, WA 98119
206.962-5040

way to the hospital. Due to the "Do Not Resuscitate" Order, the paramedics did not attempt to intubate Mr. Ginn. Mr. Ginn died during the transport.

After the hospital refused to store Mr. Ginn's remains, Fire Captain Scott Farlow and Fire Chief Mannix McDonnell directed Mr. Larsen and Mr. Wolven to bring the remains of Mr. Ginn to "Fire Station 1" of the Department. Fire Station 1 is located near downtown Bellingham, Washington. The remains of Mr. Ginn were taken out of the ambulance and put into a body bag on the garage floor of the apparatus bay in Station 1 where a reserve aid unit normally parks.

Chief Mannix McDonnell of the Bellingham Fire Department then gave authorization for multiple different Bellingham Fire Department employees to perform multiple intubations on the remains of Mr. Ginn on the garage floor. In total, eleven different employees performed a total of fifteen intubations on the remains of Mr. Ginn on the garage floor of Fire Station 1. Eleven of the intubation attempts were successful. Four of the intubation attempts were unsuccessful. The intubations performed by the eleven different employees lasted approximately 45 minutes. During that time, Mr. Ginn's body remained on the floor of the apparatus bay in Station 1 where a reserve aid unit normally parks until the funeral home picked it up.

The City acknowledges it never requested consent from the patient, a family member, or anyone else connected with the patient prior to conducting the fifteen intubations. And the City never received consent from the patient, a family member, or anyone else connected with the patient prior to conducting the fifteen intubations.

The City admits the intubations served no medical purpose to Mr. Ginn. The City further admits the intubations were outside the duties of three of the employees who performed the intubations: Hunter Elliott, Kristia Peschka, and Olivia Sund. Multiple employees reported having concerns about the inclusion of office staff (Ms. Peschka and Ms. Sund) during the intubations.

PLAINTIFF'S TRIAL BRIEF - 2
No. 2:19-cv-00955-RSL

Corr|Downs PLLC
100 WEST HARRISON STREET
SUITE N440
SEATTLE, WA 98119
206.962-5040

Following the events on July 31, 2018, the City retained Sarah Hale, an attorney at Summit Law Group, to investigate allegations of possible misconduct by employees of the City of Bellingham Fire Department related to intubations performed on the deceased body of Mr. Ginn at Fire Station 1 on July 31, 2018. Ms. Hale's investigation revealed the following:

    a. The Department had never previously allowed non-paramedic staff (Mr. Elliott) and civilian office employees (Ms. Sund and Ms. Peschka) to perform intubations on deceased bodies;

    b. The Department had never previously allowed the use of a prospective paramedic preceptor to "instruct" the civilian employees and non-paramedic staff on how to perform the intubations;

    c. The number of intubations, fifteen total (eleven successful and four unsuccessful), was far outside the number of intubations typically performed during "tube checks" by the Department;

    d. The Department had not previously performed tube checks on deceased patients following the lack of an initial intubation on the patient for a medical purpose;

    e. The location for the intubations on July 31, 2018, was unlike any location used previously and raised concerns regarding the privacy afforded to Mr. Ginn;

    f. The Department had not previously performed intubations on patients in a situation where so much time had elapsed following the time of death; and

    g. The Department had not previously used "tube checks" to evaluate the efficiency of equipment or for supervisors to provide feedback and discussion between participants about intubation technique.

Each employee who was involved in performing intubations on Mr. Ginn was disciplined by the City for their role in the incident. The City terminated the employment of Division Chief McDonnell on September 24, 2018, as a result of his role in the performance of intubations on Mr. Ginn on July 31, 2018.

PLAINTIFF'S TRIAL BRIEF - 3
No. 2:19-cv-00955-RSL

**CORR|DOWNS PLLC**
100 WEST HARRISON STREET
SUITE N440
SEATTLE, WA 98119
206.962-5040

## II.   ISSUES AT TRIAL

**A.   Dispute Over Admitted Facts in Agreed Pretrial Order.**

On March 16, 2023, the Parties submitted their Proposed Agreed Pretrial Order to the Court. Although the Parties are in agreement regarding a substantial portion of the admitted facts contained therein, there are portions of those facts in dispute. Specifically, the City objects to the following facts:

Ms. Hale's investigation revealed the following:

a.   The Department had never previously allowed non-paramedic staff (Mr. Elliott) and civilian office employees (Ms. Sund and Ms. Peschka) to perform intubations on deceased bodies;

b.   The Department had never previously allowed the use of a prospective paramedic preceptor to "instruct" the civilian employees and non-paramedic staff on how to perform the intubations;

c.   The number of intubations, fifteen total (eleven successful and four unsuccessful), was far outside the number of intubations typically performed within the practice of "tube checks" by the Department;

d.   The Department had not previously performed tube checks on deceased patients following the lack of an initial intubation on the patient for a medical purpose;

e.   The location for the intubations on July 31, 2018, was unlike any location used previously and raised concerns regarding the privacy afforded to Mr. Ginn;

f.   The Department had not previously performed intubations on patient in a situation where so much time had elapsed following the time of death; and

g.   The Department had not previously used "tube checks" to evaluate the efficiency of equipment or for supervisors to provide feedback and discussion between participants about intubation technique.

The City argues these paragraphs violate the Court's Order Denying in Part and Granting in Part Defendant's Motions in Limine (Dkt. #54), p. 3, which states, "[E]vidence that defendant violated its own policies and procedures… will be excluded as irrelevant." Although Ms. Hale's report includes statements that the intubations performed during this incident were outside the scope of the City's policy and practice in a number of respects, Plaintiff's counsel

PLAINTIFF'S TRIAL BRIEF - 4
No. 2:19-cv-00955-RSL

**CORR|DOWNS PLLC**
100 WEST HARRISON STREET
SUITE N440
SEATTLE, WA 98119
206.962-5040

revised the language to ensure he does not run afoul of the Court's Order. Mr. Fox does not intend on testifying or arguing that the City violated established policies and procedures and that the jury should punish the City for those violations. Rather, Mr. Fox intends on testifying that one of the more upsetting aspects of the report was the conclusion by Ms. Hale that many of the things done to his brother's body had never been done before. Such evidence and testimony is directly relevant to Mr. Fox's state of mind and his burden of proof of establishing damages. Mr. Fox asks the Court to overrule the City's objections in this regard and permit Mr. Fox to tell the jury the entire story of how he found out about the City's tortious conduct and the damages he sustained as a result.

### B. Mr. Fox Will Testify Live Regarding His Emotional Distress Damages.

Given that the City has admitted liability in this case, the only issue for trial is the amount of damages Mr. Fox suffered as a result of the City's tortious conduct. At trial, Mr. Fox will present evidence in the form of live testimony regarding the significant mental and emotional pain and suffering he experienced, and continues to experience, as a result of the City's repeated desecration of his brother's body on the garage floor of Station 1. Mr. Fox will testify about the pain and grief caused by learning of the City's conduct through publicly accessible newspaper and online articles. Mr. Fox will introduce as evidence the media reports that detailed the horrific nature of what the City employees did to Mr. Fox's deceased brother. He will also testify regarding the multiple instances of outrageous conduct by the City contained in the Hale report commissioned by the City.

### C. The City Seeks to Admit Inadmissible Testimony to Attack Mr. Fox's Character.

In response to Mr. Fox's live testimony regarding the significant emotional distress damages he sustained as a result of the City's admittedly tortious conduct, Mr. Fox anticipates the City will attempt to rely primarily on portions of videotaped deposition testimony from three family members (Logan Fox, Bradley Ginn, Jr., and Jai Ginn) that are irrelevant under Fed. R. Evid. 402, unfairly prejudicial under Fed. R. Evid. 403, and inadmissible under Fed. R.

PLAINTIFF'S TRIAL BRIEF - 5
No. 2:19-cv-00955-RSL

Corr|Downs PLLC
100 WEST HARRISON STREET
SUITE N440
SEATTLE, WA 98119
206.962-5040

Evid. 404 and 802.  Mr. Fox has asserted numerous objections in response to the City's deposition designations and takes this opportunity to discuss the bases for those objections here.

    1.    <u>Irrelevant and Unfairly Prejudicial Deposition Testimony (Fed. R. Evid. 402 and 403).</u>

The City seeks to admit into evidence irrelevant testimony regarding alleged altercations and prior drug or alcohol use that occurred decades ago and that have no relation to either: (a) Mr. Fox's state of mind at the time he learned of the City's desecration of his brother's body; or (b) the damages Mr. Fox sustained as a result of the City's admittedly tortious conduct.  Even if the deposition testimony was relevant to Mr. Fox's damages, the Court should still exclude this evidence because any potential probative value is outweighed by the unfair prejudice and jury confusion that would follow if Mr. Fox's objections were overruled.  "[T]he Court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

The following excerpts from the City's deposition designations provide the Court with examples of the irrelevant and unfairly prejudicial testimony the City seeks to introduce at trial. Notably, most all of this objectionable testimony relates to alleged events, including family disputes, that occurred decades before the City's tortious conduct:

> **Ginn, Jai, (Page 22:12 to 22:23)**
>
> Q.  Ok. How would you describe -- in that -- in those early years, how would you describe Brad's relationship to John Fox?
>
> A.  Honestly -- very honestly speaking, it never was good.
>
> Q.  And what do you mean --
>
> A.  Always a fistfight.  There was fights always because they -- they two brothers.  They are Fox, nephew, and John.  They were not nice to Brad.  And they raise him -- I'm going to speak exactly what happened.  They were always fighting.  There was never peace in the family.
>
>                       …

PLAINTIFF'S TRIAL BRIEF - 6
No. 2:19-cv-00955-RSL

CORR|DOWNS PLLC
100 WEST HARRISON STREET
SUITE N440
SEATTLE, WA 98119
206.962-5040

1  **(Pages 23:11 to 24:2)**

2  Q. You said they bullied him. How would they bully him? Was it physical fights, or was there other -- was it more --

3  A. It was physical fights. Yeah. Physical fights. You guys can check the history. I mean, they will hit Brad. One time they -- my husband got paid in our young days, so John lost his six bucks, and it got stuck in the couch, and Brad was sitting there and -- was sitting here and said, "Why would I take your six bucks? I just got paid." And then they start fighting. Fistfighting. Rolling on the floor. I had to call 911. I said, "Hey, this is not right." Their mom favored him. And then later, they find the six bucks. It was right here on the couch. On the -- on the -- under the -- under the metal -- I mean, the bed. So that was the kind of dumb things. I have family history. So many stories.

…

**Ginn, Jr., Bradley, (Pages 24:18 to 26:20)**

Q. Do you have any specific Christmases or Thanksgivings that you can recall seeing John Fox?

A. Yes. And mom. My most vivid memories of my Uncle John coming up for those holidays consisted of him either being high on marijuana or intoxicated on alcohol. Nine times out of ten that he was up there would always end in some kind of altercation with my father, whether it be verbal or physical.

Q. Okay. What do you mean by verbal altercation? Can you describe what you saw?

A. Very, very heated arguments. It would usually start with my Uncle John poking fun at my dad not being as successful as him or poking fun at his weight. Sometimes it would start off as innocent and it would escalate the more and more intoxicated he got.

Q. And so just to be clear, this was when you lived in Rancho Tehama?

A. That is correct.

Q. And so this was at your -- was this at your grandmother's house that this occurred?

A. Yes.

Q. Okay. And then you also said that you recall some physical altercations. Can you describe what you mean by that?

A. My father and my Uncle John getting into fist fights with each other. There was one occasion that I remember clearly. My Uncle John and my father were at the local bar that was in Rancho Tehama. I don't know the exact context of what exchanged between them. The only things that I know is that my uncle sucker punched my dad on the side of the head and then commenced to keep on hitting him to the point that my dad ended up leaving the bar and coming back

PLAINTIFF'S TRIAL BRIEF - 7
No. 2:19-cv-00955-RSL

CORR|DOWNS PLLC
100 WEST HARRISON STREET
SUITE N440
SEATTLE, WA 98119
206.962-5040

home. And then I want to say that my Uncle John ended up leaving early that visit.

Q. Do you remember what the occasion was that they -- your uncle was up during that incident?

A. It was during the summer. So I want to say that it was more than likely the 4th of July get together we usually have at my grandmother's house.

Q. And do you know what year that would have been?

A. I want to say I was ten years old when that happened. I can't remember the exact year.

Q. Did you see any injuries on your father?

A. Yes. My dad had a bloody nose and a cut above his left eye.

Q. Do you recall any other incidences of violence other than the one you just described?

A. They got into a shoving match. Again, it was on the 4th of July. I can't remember the exact year. I might have been 11 or 12 when this happened. Before it came to them throwing punches, I want to say that my grandmother got in between them and told them both to stop.

In addition to seeking to admit irrelevant deposition testimony regarding decades old family disputes and alleged prior alcohol or drug use, the City seeks to admit deposition testimony suggesting Mr. Fox recently made vague, racially insensitive remarks—well after the incident in question. The following is a designation of the Bradley Ginn, Jr. deposition made by the City:

**Ginn, Jr., Bradley, (Page 27:2 to 27:15)**

Q. And then what about when you were an adult? Did you have -- did you communicate with your uncle?

A. Very seldomly. I did have him on social media and he would comment on pictures of my son. He would send me messages sometimes. They were usually just stupid, silly videos. I stopped having contact with him. I want to say last year I stopped talking with him. He sent me some pretty racially insensitive videos regarding the climate of politics right now.

The City also seeks to admit voluminous deposition testimony from Logan Fox regarding the relationship he had with his father growing up as a child, which has nothing to do with Mr. Fox's state of mind or the mental and emotional pain and suffering he experienced as

PLAINTIFF'S TRIAL BRIEF - 8
No. 2:19-cv-00955-RSL

CORR|DOWNS PLLC
100 WEST HARRISON STREET
SUITE N440
SEATTLE, WA 98119
206.962-5040

a result of the City's tortious conduct involving his brother's body decades later.  For example, the City designates the following testimony from the deposition of Logan Fox:

**Fox, Logan, (Page 17:2 to 17:16)**

Q.   What was your relationship with your father like while you were a child?  And we'll say from the time you were born until eighth grade.

MR. DOWNS:  Objection.  Relevance.

Q.  (BY MR. LEWIS)  You can answer if you can.

A.  So my relationship was okay.  It wasn't great.  You know, he paid rent and fed me, things like that, but I wouldn't say it was a great relationship.

Q.  So you describe it as okay.  Why was it -- or not great.  Why was it okay or not great?

A.  He always was kind of, during the early stages, kind of when he first moved to Winters, he was big on partying and kind of hopping around and dating, you know, younger women, going to parties, things like that.  You know, doing illicit drugs, things like that.

…

**(Pages 18:10 to 19:12)**

Q.   So I think my last question was how what you just described about your father during this time related to your relationship with him.

MR. DOWNS:  Objection.  Relevance.

Q.  (BY MR. LEWIS)  You can go ahead and answer.

A.   Okay.  Perfect.  He would get angry sometimes, you know, definitely verbally abusive.  He was arrested a few times.  So it was a small town, you know, people saw it in the paper when it was posted, so, you know, kind of embarrassing when people would talk about it.

Q.  How was he verbally abusive.

MR. DOWNS:  Objection.  Relevance.

A.  He would get in our faces.  He threw things at my sister.  There's times he grabbed me by my shirt and drug me up the stairs.

Q.  (BY MR. LEWIS)  So what was your relationship with your father like during your teenage years?

MR. DOWNS:  Objection.  Relevance.

A.  I tried to stay as busy as I could, trying to stay away from the house.  I was part of academic decathlon in the mornings, had a job, did track and field and took various AP classes, involved in student government.  So just try to keep

PLAINTIFF'S TRIAL BRIEF - 9
No. 2:19-cv-00955-RSL

CORR|DOWNS PLLC
100 WEST HARRISON STREET
SUITE N440
SEATTLE, WA 98119
206.962-5040

myself busy and try to, you know, distance myself from being home as much as I could.

Q.  (BY MR. LEWIS)  Why did you do that?

MR. DOWNS:  Objection.  Relevance.

A.  Just because he wasn't a pleasant person to be around.

…

**(Page 20:7 to 20:24)**

Q.  And why is it nonexistent since you moved out of his house?

MR. DOWNS:  Objection.  Relevance.

A.  So --

Q.  (BY MR. LEWIS)  You can answer.

A.  I went to kind of mend the relationship.  I was in a bad place financially, you know, going to school and trying to, you know, cover all those expenses, and tried to go back to mend relations with my dad but figured that he's who he is and he's not going to change for anyone kind of thing.

Q.  What do you mean by that, he is who he is but wasn't gonna change?

MR. DOWNS:  Objection.  Relevance.

A.  I think he's just a spiteful person.  He tries to take advantage of people.  He latches onto women and tries to, you know, use them to his own benefit.  And that's since him and my mom split.

…

**(Page 22:11 to 22:22)**

Q.  And since you've moved away, you have no relationship with him?

A.  No.

Q.  Why did your relationship change from being fairly close and living with him -- while you were living with him to having no relationship?

MR. DOWNS:  Objection.  Form.  Or excuse me.  Relevance.

A.  He was verbally abusive to me when I was working with him.  He would yell in my face.  He would call me stupid, and that's when I decided to move with my sister because it just wasn't good for my mental health.

The only purpose for introducing the type of irrelevant deposition testimony is to present Mr. Fox in a negative and prejudicial light, which is improper and unduly prejudicial under Fed. R. Evid. 403; *see, e.g.*, *Arthur v. Whitman Cty.*, No. CV-12-365-LRS, 2014 WL 11515841, at *1 (E.D. Wash. July 3, 2014) (excluding emails not received or reviewed by the moving party

PLAINTIFF'S TRIAL BRIEF - 10
No. 2:19-cv-00955-RSL

because the prejudicial effect outweighed the probative value); *Quinn v. Everett Safe & Lock, Inc.*, 53 F. Supp. 3d 1335, 1341 (W.D. Wash. 2014) (excluding evidence of plaintiff's alleged marijuana use as unduly prejudicial when such use was not known to defendants). This line of questioning would also inflame the jury on a personal level and distract and confuse the jury from the issue to be decided in their verdict.

      2.      <u>Improper Character Evidence (Fed. R. Evid.404).</u>

Much of the City's designated deposition testimony identified above also violates Fed. R. Evid. 404. The City's insistence on introducing this testimony is an attempt to improperly introduce inadmissible character evidence. Fed. R. Evid. 404(a); *see also Houserman v. Comtech Telecomms. Corp.*, 519 F.Supp.3d 863 (W.D. Wash. 2021) ("Rule 404(a) of the Federal Rules of Evidence prohibits evidence of a person's character or character trait to prove that on a particular occasion the person acted in accordance with the character or trait."). Evidence of prior crimes, wrongs, or acts is also presumptively inadmissible. *See* Fed. R. Evid. 404(b).

It is clear the City intends on engaging in a smear campaign against Mr. Fox by trying to introduce allegations of poor conduct, drug and alcohol use, physical and verbal abuse, and bullying to try and distract the jury from the relevant issues surrounding the amount of damages Mr. Fox is entitled to as a result of the City's tortious conduct. As much as the City wants to make this case about Mr. Fox's character by introducing irrelevant and inadmissible deposition testimony regarding family disputes, it is undisputed that Mr. Fox's character is not at issue. The Court should sustain Mr. Fox's objections to such testimony and prevent the City from introducing or soliciting irrelevant, *ad hominem* attacks on Mr. Fox's character, including introduction of the above-reference irrelevant and highly prejudicial deposition testimony regarding allegations of Mr. Fox's conduct that occurred decades before his brother's death.

      3.      <u>Inadmissible Hearsay Testimony (Fed. R. Evid. 802).</u>

Finally, the Court should sustain Mr. Fox's objections because much of the objectionable deposition testimony also qualifies as inadmissible hearsay. Hearsay is defined

PLAINTIFF'S TRIAL BRIEF - 11
No. 2:19-cv-00955-RSL

CORR|DOWNS PLLC
100 WEST HARRISON STREET
SUITE N440
SEATTLE, WA 98119
206.962-5040

as "a statement that the declarant does not make while testifying. . . [that] a party offers in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). "In the absence of a procedural rule or statute, hearsay is inadmissible unless it is defined as non-hearsay under Federal Rule of Evidence 801(d) or falls within a hearsay exception under Rules 803, 804 or 807." *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 778 (9th Cir. 2002). In this case, the City is attempting to introduce irrelevant, unfairly prejudicial, and improper character evidence to prove the truth of the matter asserted.

Some of the more egregious examples of the inadmissible hearsay testimony contained in the City's designations include the following from Mr. Ginn, Jr.'s deposition:

**Ginn, Jr., Bradley, (Pages 30:18 to 31:23)**

Q. Did your father ever tell you how he felt about John Fox?

A. He did.

MR. DOWNS: Objection. Calls for hearsay.

Q. (BY MR. GOOD) You can answer.

A. He stated many times that he didn't like John very much, mainly because of John's attitude towards him. His arrogance and the constant fighting that happened between the two of them.

Q. Can you describe what John's attitude towards your father was?

A. My Uncle John always felt that he was better than my father.

Q. And why do you say that?

A. He would always state that he makes more money than him. He's got a nicer car than he does. He lives in a nicer house. Would constantly brag about my cousins being in extracurricular activities. The women that he would end up shacking up with.

Q. Okay. How did your father feel about that attitude towards him?

A. He didn't like it.

MR. DOWNS: Objection. Lacks personal knowledge.

Q. (BY MR. GOOD) You can answer the question.

A. He didn't like the remarks that he made.

The City also attempts to introduce similar inadmissible hearsay testimony from Logan Fox regarding conversations he was not a party to and did not overhear:

PLAINTIFF'S TRIAL BRIEF - 12
No. 2:19-cv-00955-RSL

CORR|DOWNS PLLC
100 WEST HARRISON STREET
SUITE N440
SEATTLE, WA 98119
206.962-5040

**Fox, Logan, (Pages 32:10 to 33:14)**

Q. And can you describe what you heard from that conversation?

MR. DOWNS: Objection. Calls for hearsay.

A. I did not hear the conversation. I heard conversation up to the place after, when I asked my dad, "Who were you talking to on the phone?" And together we spoke and he said, "That was my brother and he was asking me for a kidney because he needs a kidney transplant." And I asked if he was going to do it, and his response was, "I'm not giving him my effing kidney." And I'm paraphrasing it because that's "fuck" is an explicative, but that's what he said regarding Bradley.

Q. (BY MR. LEWIS) So you didn't overhear the phone conversation between your dad and Mr. Ginn, correct?

A. No. I just asked him who he's on the phone with and he said -- and together we had a conversation saying it was his brother asking him for a donation of a kidney, and he said, "I'm not giving him my effing kidney."

Q. Did you and your dad have any further conversation on that subject at any point?

A. Yes. And that's the big reason I'm here today because I said that if I got gotten mad at that, and I said, "What if one of my sisters needed a kidney?" "I would give them a kidney in a heartbeat."

Q. And did your father have a reaction to that?

A. He essentially said that he messed up his own life, that those are his decisions and he's not giving him his kidney.

The City should not be permitted to introduce this inadmissible hearsay testimony. Mr. Fox asks the Court to sustain its numerous hearsay objections related to the City's deposition designations.

D. **The City Should be Prohibited From Calling Michelle Glick to Testify at Trial.**

The City implicitly acknowledges Logan Fox's testimony identified above is inadmissible hearsay by disclosing Mr. Fox's estranged ex-wife as an "impeachment" witness for the first time on March 15, 2023, to testify on a purely collateral matter. As argued in Plaintiff's pending Motion *in Limine*, there are two bases for the Court to exclude Ms. Glick from testifying at trial.[1] First, the City improperly intends on calling Ms. Glick to offer

---

[1] *See* Dkt. Nos. 57 and 58.

PLAINTIFF'S TRIAL BRIEF - 13
No. 2:19-cv-00955-RSL

impeachment testimony regarding a collateral issue invited by questions posed during cross-examination.  Second, to the extent the City is arguing Ms. Glick will testify regarding material issues, the City's failure to timely disclose Ms. Glick as a potential witness violates Fed. R. Civ. P. 26 and 33.  Based on the City's discovery violations, the Court should exclude Ms. Glick from testifying at trial pursuant to Fed. R. Civ. P. 37(c)(1).

        1.      <u>The City Seeks to Introduce Impeachment Testimony Regarding a Collateral Matter to Try and Admit Otherwise Inadmissible Evidence.</u>

A witness may not be contradicted by extrinsic evidence on a collateral matter.  *See, e.g., Ortiz v. Yates*, 704 F.3d 1026 (9th Cir. 2012) (citing *United States v. Kincaid-Chauncey,* 556 F.3d 923, 932 (9th Cir. 2009) ("When impeaching by contradiction, the fact to be contradicted must be material.").  When making the decision whether to permit impeachment by contradiction, "trial courts should consider the Rule 403 factors, such as confusion of the jury or the cumulative nature of the evidence."  *United States v. Castillo,* 181 F.3d 1129, 1132-33 (9th Cir. 1999).  Here, the City is improperly attempting to call Ms. Glick to impeach Mr. Fox on an immaterial and collateral issue (*i.e.,* conversations he had with his estranged ex-wife after litigation was well underway in this matter).  This line of questioning has nothing to do with the underlying issue of the nature and extent to which Mr. Fox suffered compensable mental and emotional pain and suffering as a result of the City's desecration of his brother's body.

If the City argues that the anticipated testimony of Ms. Glick concerns a material, non-collateral issue, then the City should have previously: (1) disclosed Ms. Glick in its Initial Disclosures; and (2) identified Ms. Glick in response to Plaintiff's written discovery, which asked the City to identify "any persons" who have "any knowledge concerning the factual subject matter of this action."  Rule 26(a) requires that "a party must, without awaiting a discovery request, provide to the other parties" certain identifying information about "each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses." Fed. R. Civ.

PLAINTIFF'S TRIAL BRIEF - 14
No. 2:19-cv-00955-RSL

**CORR|DOWNS PLLC**
100 WEST HARRISON STREET
SUITE N440
SEATTLE, WA 98119
206.962-5040

1  P. 26(a)(1)(A). The failure to comply with Rule 26(a) disclosure requirements may result in the
2  imposition of sanctions pursuant to Rule 37, including exclusion of a witness at trial.  A party
3  that does not timely identify a witness under Rule 26 may not use that witness to supply
4  evidence at a trial "unless the failure was substantially justified or is harmless." Fed. R. Civ. P.
5  37(c)(1).  Here, if Ms. Glick's trial testimony relates to material issues, then there is no
6  justification (much less substantial justification) for the City's complete failure to disclose
7  Ms. Glick as a possible witness until the eve of trial.
8       In addition to impeachment being limited to matters that are material and non-collateral,
9  a witness may be impeached by contradiction only if "the statements in issue [have] been
10 volunteered on *direct* examination." *United States v. Green,* 648 F.2d 587, 596 n.12 (9th Cir.
11 1981) (emphasis added). Notably, "extrinsic evidence may not be admitted to impeach
12 testimony invited by questions posed during cross-examination." *Castillo,* 181 F.3d at 1133.
13 Accordingly, even if Ms. Glick's anticipated testimony was a non-collateral matter material to
14 the issue at trial, Mr. Fox may be impeached by contradiction *only* if the statements were
15 volunteered during *direct* examination.  Mr. Fox has no intention of volunteering any
16 information regarding conversations he may have had with his estranged ex-wife years after
17 litigation was commenced. Assuming Mr. Fox does not address this issue during direct
18 examination, the City should not be permitted to raise this collateral issue during cross-
19 examination solely for the purpose of then calling Ms. Glick to offer impeachment testimony.
20      The Court should prohibit the City from introducing into evidence at trial this irrelevant
21 and highly prejudicial testimony related to inadmissible character evidence regarding a
22 collateral matter from a previously undisclosed witness.
23 **E.**    **The Court Should Reject Defendant's Proposed Verdict Form.**
24      Mr. Fox objects to the City's request to include a preliminary question in the verdict
25 form before addressing the question of the amount of damages.  Specifically, Mr. Fox objects
26 to the inclusion of the following question:
27

PLAINTIFF'S TRIAL BRIEF - 15
No. 2:19-cv-00955-RSL

CORR|DOWNS PLLC
100 WEST HARRISON STREET
SUITE N440
SEATTLE, WA 98119
206.962-5040

1. Does the jury find that the plaintiff has established by the preponderance of the evidence, that the City of Bellingham caused him damages?

Yes ___        No ___

*If you answered "yes" to the above question, please proceed to question #2. If you answered "no" stop, sign the verdict form, and advise the Court.*

The City of Bellingham has already stipulated and agreed it is liable for Mr. Fox's claim of tortious interference with Bradley Ginn, Sr.'s corpse. By including this question, the City is essentially asking the jury to determine whether the City is *liable* for damages before moving on to the question regarding the *amount* of damages to be awarded. The parties have agreed on a proposed jury instruction that is based on Ninth Circuit Model Civil Jury Instruction Nos. 5.1, 5.2. That instruction sets forth Mr. Fox's burden of proof on damages in this case:

> It is the duty of the Court to instruct you about the measure of damages.
>
> The defendant has admitted liability for tortuous interference with the corpse of Bradley Ginn Sr. Therefore, you must determine the plaintiff's damages. The plaintiff has the burden of proving damages by a preponderance of the evidence. Damages means the amount of money that will reasonably and fairly compensate the plaintiff for any injury caused by the defendant. You should consider the mental and emotional pain and suffering experienced and that, with reasonable probability, will be experienced in the future.
>
> It is for you to determine what damages, if any, have been proved. Your award must be based upon evidence and not upon speculation, guesswork, or conjecture.

Based on this straightforward language, the jury will be properly instructed on damages. There is no need to include a separate question on the verdict form regarding whether Mr. Fox has established by a preponderance of the evidence that the City caused Mr. Fox's damages. The inclusion of this question on the special verdict form serves no other purpose than to create inappropriate hurdles for Mr. Fox and to confuse the jury. Mr. Fox requests the Court reject the City's proposed question number 1 and proposes the following single question be included on the verdict form:

1. State the amount of damages that you award the plaintiff as compensation for his injuries: $_____.

PLAINTIFF'S TRIAL BRIEF - 16
No. 2:19-cv-00955-RSL

CORR|DOWNS PLLC
100 WEST HARRISON STREET
SUITE N440
SEATTLE, WA 98119
206.962-5040

DATED this 21st day of March, 2023.

          CORR|DOWNS PLLC

By *s/ Joseph P. Corr*
Jacob M. Downs, WSBA No. 37982
Joseph P. Corr, WSBA No. 36584
100 W. Harrison St., Suite N440
Seattle, WA 98119
Telephone: 206.962.5040
jdowns@corrdowns.com
jcorr@corrdowns.com

Attorneys for Plaintiff

PLAINTIFF'S TRIAL BRIEF - 17
No. 2:19-cv-00955-RSL

**CORR|DOWNS PLLC**
100 WEST HARRISON STREET
SUITE N440
SEATTLE, WA 98119
206.962.5040

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on March 21, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Michael E. Good, WSBA #44857
Senior Assistant City Attorney
City of Bellingham
210 Lottie Street
Bellingham, WA 98225-4089
Telephone: (360) 778-8270
megood@cob.org

Robert L. Christie, WSBA #10895
Salim D. Lewis, WSBA #52660
Thomas P. Miller, WSBA #34473
Christie Law Group, PLLC
2100 Westlake Ave N, Suite 206
Seattle, WA 98109
Telephone: (206) 957-9669
bob@christielawgroup.com
salim@christielawgroup.com
tom@christielawgroup.com

DATED this 21st day of March, 2023.

    *s/ Danna Hutchings*
Danna Hutchings
Legal Assistant

PLAINTIFF'S TRIAL BRIEF - 18
No. 2:19-cv-00955-RSL

**CORR|DOWNS PLLC**
100 WEST HARRISON STREET
SUITE N440
SEATTLE, WA 98119
206.962-5040